In re ROYAL CIRCLE OF FRIENDS BLDG. CORPORATION.

RICHEY v. KALISH et al.

BURR et al. v. SAME.

TRUST CO. OF CHICAGO v. SAME.

Nos. 9154, 9155, 9157.

Circuit Court of Appeals, Seventh Circuit.

Jan. 18, 1947.

Luther Swantrom and Benjamin G. Clanton, both of Chicago, Ill., for Richey.

Maurice E. Burr, of Chicago, Ill., for Burr and others.

Lazar H. Gladstone, of Chicago, Ill., for Trust Co. of Chicago.

Edwin A. Halligan, Irving Bilton and Samuel M. Lanoff, all of Chicago, Ill., for appellees.

Before EVANS and SPARKS, Circuit Judges, and LINDLEY, District Judge.

**540**

EVANS, Circuit Judge.

These appeals are by two bondholders, and by the indenture trustee, from an order approving a Chapter X, 11 U.S.C.A. § 501 et seq., petition as having been filed in good faith.

The debtor corporation, the Royal Circle of Friends Building Corporation owns a brick store and office buildings located at 51st and Michigan Avenue, in the City of Chicago. The property has been the subject of a prior 77B reorganization, 11 U.S.C.A. § 207, and also of state court mortgage foreclosure.

Appellants charge that the finding of the trial court, that the petition was filed in good faith, is without evidentiary support; that the petition is fatally defective because not verified,[1] as required by the statute, 11 U.S.C.A. § 41, sub. c; that the pending state foreclosure proceeding wherein a decree of sale[2] had been entered prior to these proceedings, is more advantageous to the bondholders and should be permitted to proceed and that the trial court erroneously found that a conflict of interest existed in representation by the attorneys involved in the suit.

The story of the proceedings and of this property may be stated as follows: A mortgage for $120,000 was placed against the property, November 15, 1921, due in 1931; a plan of reorganization under 77B was confirmed August 5, 1935, extending the maturity of the bonds for ten years.[3] In the course of the execution of the plan, the principal of bonds outstanding was reduced to $90,600. However, as of September, 1945, the debt, with interest at five per cent was $104,000. The trial court in the instant cause found the property to be worth $100,000.[4]

On October 15, 1945, a foreclosure decree in the Illinois State Court was entered in a suit brought by the indenture trustee May 19, 1945.

The instant reorganization proceedings were instituted in the District Court, December 14, 1945, by creditors holding $5,900 in bonds. On December 21, 1945, a cash bid of $65,000 was made for the property in the state foreclosure suit, which sum, it is claimed, would net first mortgage bondholders, sixty-three cents on the dollar, and there is a possibility of their receiving up to twelve cents additional from funds of the company now on hand.

The property was also subject to a second mortgage, dated September 15, 1922, for $25,000, due in ten years, and a third mortgage, dated November 16, 1925, in the amount of $38,200.

The testimony disclosed that the condition of the building was not good; a new heating plant, costing eight to ten thousand dollars is needed, and the 1945 taxes, not less than $2,300, are unpaid.

A Dr. Williams, late father of appellant Richey, was sole stockholder of debtor, and held title to the realty prior to his transfer of it to the corporation. He also executed the third mortgage.

Appellant Burr owns $4,300 of first mortgage bonds and appellant Richey, claims to own more than forty per cent of all first mortgage bonds outstanding.

One of the stores located on this property is a drug store. The lessee pays a rental of a $100 a month. Williams, on March 30, 1943, executed this lease for a term of ten years, with an option for five years' renewal. This, it is claimed, was contrary to the 77B plan of reorganization

---

[1] Neither is the indenture trustee's or the debtor's answer verified.

[2] The decree of sale was not confirmed. A prior state foreclosure suit in the name of one Bogden was dismissed at the instance of the Indenture Trustee because not a representative suit, and it then instituted its own suit. Appellant Richey purchased Bogden's bonds at 45¢ on the dollar.

[3] The plan also provided for a lease of the property to Williams for ten years

for $600 a month rental, and after two years, 80% of net rentals over $600 was to go to the benefit of the bondholders. The plan stated Williams was the owner of $3,700 bonds which should not be entitled to interest during the plan and none of his bonds was to be redeemed until all others were paid. The plan also extended the principal and interest on the second mortgage ten years.

[4] A state court appraisal placed the property's value at $79,000, less the cost of a new heating plant.

which provided that Williams should place no incumbrance on the property. The plan at that time had something over a year to run. Williams died February 23, 1943. There was testimony that the drug store could now be rented for $250 a month, and also testimony that the reasonable rental value at the time the lease was executed was $165. One witness testified the reasonable rental value of all the property was $1835 per month and that the property's fair valuation based on that estimate was $110,000.

*Verification.* Appellants argue that the Chapter X petition should have been dismissed because it lacked verification. They raised this defense in their answer and asked for the dismissal of the petition on such ground.

The statute, 11 U.S.C.A. § 41, sub. c, provides that "All pleadings setting up matters of fact shall be verified under oath." This provision has special reason for its application in involuntary bankruptcy proceedings, and should not be lightly disregarded. As in this case, some of the allegations are sharply challenged as to veracity, and incalculable damages and expense can follow reckless or false allegations in bankruptcy petitions.

Appellees state that, "While it is true Section 18, sub. c, of the Bankruptcy Act provides that all pleadings setting up matters of fact be verified, yet the general tendency of the practice in the Federal Courts is to dispense with verifications."

█ Precedents, interpreting this section, have generally concerned themselves with imperfect or defective verifications, rather than with the effect of the complete lack of verification. Such precedents hold: (1) that imperfect verification is not a jurisdictional defect[5]; (2) that amendment may cure imperfect verification[6]; and (3) such defective or imperfect verification may be waived.[7]

Appellees contend there was such waiver in the instant case because the objection raised by the answers was not pressed at the trial. Appellants on the other hand assert that the objection raised by the answer was later stressed in formal briefs filed with the court.

█ We conclude that the requirement of verification is not jurisdictional in the strict sense; that it may be waived if the party for whose benefit it was enacted failed to claim advantage of it; that appellants sufficiently challenged the defect by asserting it in their answer and later in their trial brief. They did not waive the lack of the verification.

█ On the other hand, enlightened procedure does not demand that the judgment of the trial court be reversed with directions to dismiss the defective petition. Rather, on this point, we deem it sounder practice to remand the proceedings to the trial court to permit the District Court, if satisfied that his discretion should be exercised, in favor of plaintiffs, to so order.[8]

This conclusion finds support in the District Court's finding "that the material allegations of the petition are sustained by the proofs." While appellants earnestly argue this finding lacks support in the evidence, we are unable to say there is no sub-

[5] Harris v. Mills Novelty Co., 10 Cir., 106 F.2d 976; Kattelman v. Madden, 8 Cir., 88 F.2d 858; Green River Deposit Bank v. Craig, D.C., 110 F. 137; In re Chequasset Lumber Co., D.C., 112 F. 56; Leidigh Carriage Co. v. Stengel, 6 Cir., 95 F. 637; In re Farthing, D.C., 202 F. 557; In re Bellah, D.C., 116 F. 69; Manke v. United States, 9 Cir., 38 F.2d 624.

[6] Armstrong v. Fernandez, 208 U.S. 324, 28 S.Ct. 419, 52 L.Ed. 514; Collier on Bankruptcy, Vol. 1, p. 664; Harris v. Mills Novelty Co., supra; Kattelman v. Madden, supra; In re Robbins, D.C., 292 F. 653; In re California Pac. R. Co., Fed.Cas.No. 2,315.

[7] 41 Amer.Juris., "Pleading." Sec. 287; Riverside Oil & Ref. Co. v. Swanson, 138 Okl. 47, 279 P. 905, 67 A.L.R. 1283; Cyclopedia of Federal Procedure, 2d Ed., Sec. 1454; In re Meuer, 144 F. 445; In re Miller, D.C., 192 F. 730; Harris v. Madden, supra; Lackawanna Leather Co. v. LaPorte Carriage Co., 7 Cir., 211 F. 318; Simonson v. Sinsheimer, 6 Cir., 96 F. 948; Manke v. United States, 9 Cir., 38 F.2d 624; Rosaly v. Gonzalez, 1 Cir., 106 F.2d 169.

[8] See Sabin v. Blake-McFall Co., 9 Cir., 223 F. 501.

stantial evidence to sustain it. Herewith we briefly state the arguments pro and con on this issue:

*Pro:*

1. Relatively high finding of value—$100,000 as against $90,600 principal of first mortgage ($104,000 with interest).

2. Evidence of gross under rental of stores and offices, the drug store being rented for $100 per month, and the estimate of reasonable rental being $250, would indicate some profits might be salvaged in a Chapter X proceeding which would net the bondholders greater value than the possible maximum of 75¢ receivable under the state foreclosure sale.

3. Appellant Richey's interest, while substantial—over 40%—of first mortgage, was not all acquired at full face value, but much of it at 45¢ on the dollar, so that her large interest is not as substantial as it at first seems.

4. State foreclosure decree did not take sufficient cognizance of rights under 77B plan, i. e., the provision against creation of liens upon the property (as by the drug store lease).

*Con:*

1. Prior 77B proceedings did not clear up the financial problems of debtor, even after ten year extension (although 25% of the bonds were redeemed during that period).

2. Bidder at state foreclosure sale was nominee of tenant which held the lease which is the subject of heated controversy both as to rental fee and term.

3. Appellees represent less than 7% of outstanding first mortgage.

Petitioners were evidently not content to take a possible 75¢ on the dollar and preferred to risk postponement of realization of that much of the principal in the hope of recovering principal and interest in full. Such a hope might seem ephemeral in view of the completion of a prior 77B reorganization—but *some* progress was made under that reorganization, and if the bondholders are content to wait still longer perhaps their hopes will be realized. At least we can not say there is no support for the District Court's finding of petitioners' good faith in seeking relief of the Federal Court in Chapter X proceedings. They might well have reasonably concluded that the $65,000 bid at the state foreclosure sale was grossly inadequate, in view of the later finding of the District Court that the property had a value of $100,000.

The findings and conclusions of the District Court are approved but the order is reversed and remanded to permit the District Court to exercise its discretion in allowing petitioners to verify their amended petition.